Samuel J. Silverman, S.
This is an executorial accounting proceeding by the executrix of the estate of George Plotkin (“ decedent ”). Frank Plotkin (“ claimant ” or “ objectant ”) filed a claim on a promissory note with the executrix for $63,000 and interest, acknowledging three payments of $795 each. The executrix rejected this claim and accordingly claimant Frank Plotkin objected to the accounting. (Frank having died, the objection and the claim are prosecuted by the executor of Frank’s estate.)
After a hearing, Surrogate Cox disallowed the claim and dismissed the objection. On appeal, the Appellate Division reversed this decision (28 A D 2d 528 [May 25, 1967]). The Appellate Division directed that the proceeding be * ‘ remanded to the Surrogate to determine the amount due to objectant.” The Appellate Division further said: “ Objectant concedes that the checks given subsequent to the note were in part payment. It also appears that objectant has realized on certain funds claimed to be security. These sums should be determined and the resulting credit on the claim established, and for that purpose the matter is remanded to the Surrogate.” Pursuant to that mandate a hearing has been held and the court now decides the issues on that hearing.
*756 A. Direct Payments by George Plotkin
The promissory note, the basis of objectant’s claim, is dated June 1,1963.
Although the notice of claim seems to concede that there have been three payments each for $795, the record shows that only two such payments were made after the date of the note. Accordingly I find that during his lifetime, decedent paid to the claimant, Frank Plotkin, $1,590 on account of the obligation represented by the note.
B. Proceeds of Aberdeen and Fidelity Funds
The note claimed on recites that it was “ to replace all prior notes.” There is a history going back several years of prior notes from decedent George to claimant Frank Plotkin. In May, 1961, the date of the Aberdeen transaction to be described, the notes theretofore given by decedent to claimant totalled $45,000 and there was apparently an outstanding check from decedent to claimant for $5,000. In September, 1961, the date .of the Fidelity transaction referred to below, the notes totalled $55,000 and there was the outstanding check for $5,000 making a total liability presumably of $60,000.
Aberdeen Fund is an open-end mutual common stock trust fund which issues securities known as Aberdeen Fund Shares. Such shares also constitute the corpus of another common-law trust known as Aberdeen Investment Programs. The latter is essentially a device whereby investors may subscribe on a systematic installment payment plan for Aberdeen Shares.
There is a very similar device with respect to another common-law trust referred to as Fidelity Capital, in which the “ Fidelity Capital Investment Plan” plays the same role as Aberdeen Investment Programs, with respect to shares of Fidelity Capital Fund, which is analogous to Aberdeen Fund.
On May 2, 1961, decedent George Plotkin became an investor in Aberdeen Investment Programs. The face amount of the program, i.e. the amount he obligated himself to invest, was $30,060 payable in 180 monthly payments of $167 each. The payments so made were to be applied to the purchase of shares of Aberdeen Fund. At the end of the period covered by the agreement, the investor (decedent) had the right to receive from a custodian bank all funds, shares and cash, if any, held for his account. There were also provisions for partial withdrawal of shares after at least 13 monthly payments. The program also called for life insurance on investor-decedent’s life. Upon death of the investor the unpaid balance of the monthly *757 program would immediately become due and payable as an obligation of the estate of the investor to the sponsor Aberdeen Investor Programs. “ It is the function of the life insurance to provide solely for the foregoing obligation ’ \
Under date of May 6, 1961, pursuant to one of the options contained in the program, decedent George Plotkin executed and filed (with Aberdeen Investor Programs or the custodian bank) a “ Designation of Beneficiary ” which directed the custodian bank on termination or liquidation of the program or on receipt by the bank of proof of the investor George Plotkin’s death or legal incapacity to transfer to the beneficiary such fund shares as might then be held under the program. The beneficiary named was claimant Frank Plotkin.
Decedent George Plotkin apparently entered into a similar arrangement with Fidelity Capital. Again, he made a designation of beneficiary in Frank Plotkin’s favor dated September 18, 1961. The form of designation of beneficiary for Fidelity Capital appears to be word for word the same as that for Aberdeen and the amount that George obligated himself to buy was $30,000.
After George’s death, on September 17,1963, the life insurance issued in connection with the Aberdeen Plan was paid and applied to satisfy decedent’s obligation on his contract. In January, 1964 Frank Plotkin, exercising his rights as designated beneficiary of the Aberdeen Investor Programs, liquidated his interest in the Aberdeen Fund shares and received a check for $27,776.61 in liquidation of the then held 11,775 shares. Of this amount, Frank Plotkin’s attorney retained $2,776.61 as a fee. The Frank Plotkin estate concedes that the George Plotkin estate is entitled to a $25,000 credit on the $63,000 promissory note obligation.
There is a dispute as to whether the George Plotkin estate was entitled to receive or retain any part of the $27,776.61 and if so whether the credit should be the entire $27,776.61 or only $25,000. There is a further dispute between the parties as to whether the Aberdeen and Fidelity Funds constitute security for the indebtedness to George Plotkin and as to what the rights of the parties are with respect to these securities.
1. The remand from the Appellate Division in terms merely required this court to determine the amounts realized and the resulting credit on the claim and to determine the amount due to claimant-object ant. But I think to do that I will have to determine what the rights of the parties are with respect to the Aberdeen and Fidelity Capital Funds. Specifically it may well be that the right of the claimant to deduct attorneys’ fees may *758 depend upon whether claimant is a secured creditor (cf. Spadaro v. Chenango County Nat. Bank & Trust Co., 156 Misc. 230, 232 [Sup. Ct., 1935]).
This court has subject matter jurisdiction to determine the rights of the parties with respect to the securities. (SCPA 209, subd. 4; SCPA 202; Matter of Raymond v. Davis, 248 N. Y. 67.)
Further, as it is necessary for this court in the accounting proceeding to consider what the relationship of the parties with respect to these mutual funds is, the court should make a decree declaring those rights (cf. Matter of Bauer, 55 Misc 2d 808 [Surrogate’s Ct., Nassau County, 1968]). This court has, of course, jurisdiction “ to make a full, equitable and complete disposition of the matter ” (SCPA 201, subd. 3); and as matter of policy it should do so to the extent that it fairly can. After the Appellate Division remanded the case to this court, claimant’s attorney suggested that this court hold up further proceedings until after the determination to be made in the United States District Court in Massachusetts of the rights of the parties with respect to the Fidelity Capital Fund, contending that it would not be possible for this court to decide the issues remanded to it by the Appellate Division unless and until the issues with respect to the Fidelity Capital Fund were decided. Thereafter, the United States District Court in Massachusetts declared that it would hold up further proceedings in that court until after the completion of all proceedings in the New York State courts.
In the present proceedings, the parties have stipulated that this court shall decide the relative interest of the parties in these two mutual funds. In objectant’s post-hearing brief objectant states: ‘ ‘ Necessarily a determination herein also must consider the respective claims of the Estate of Frank Plotkin and the Estate of George Plotkin to the ownership of the mutual fund interests.”
Accordingly, I propose, so far as the record now before me will permit, to decide the interest of the parties in these two mutual funds.
2. It is conceded that decedent George Plotkin by the designation of beneficiary did not intend to make a gift to claimant Frank Plotkin, that any net proceeds realized by claimant or his estate from these mutual funds must be credited against the indebtedness of claimant to decedent, and that if there be a surplus the estate of decedent George Plotkin is entitled to the surplus. Claimant-objectant, estate of Frank Plotkin, contends *759 that these two mutual funds were security for the obligation of George Plotkin to Frank Plotkin.
3. If George Plotkin’s estate is solvent, then George Plotkin had the right to direct that a particular portion of his assets, here the mutual fund shares, should be used to pay a particular debt (Little Falls Nat. Bank v. King, 53 App. Div. 541, 544-546 [4th Dept., 1900]). Though even then the right to charge claimant Frank Plotkin’s attorneys’ fees against the recovery would seem to depend on whether there was a valid security interest in the mutual funds.
4.1 hold that the designation of beneficiary was valid although it was not in testamentary form. In essence, it seems to me this was a revocable trust, with the bank holding securities in trust, deliverable to Frank Plotkin on George Plotkin’s death but with George Plotkin reserving a power of revocation or amendment. Such a revocable inter vivos trust has traditionally not been required to be in testamentary form. Again, the situation is analogous to insurance contracts in which the insured reserves the right to change beneficiaries, or in which the insured designates one of the optional modes of settlement of the payments under the policy (cf. Hall v. Mutual Life Ins. Co., 282 App. Div. 203 [1st Dept., 1953], aifd. 306 N. Y. 909 [1954]). And there are many pension and retirement systems under which the employee may designate a beneficiary on death, and that designation need not be in testamentary form.
5. But for one fact I would, I think, have no difficulty in holding that the mutual funds were security for George Plotkin’s obligation to Frank. That stumbling block fact is that by his agreement with the funds, decedent George Plotkin retained during his lifetime complete control of the funds vis-a-vis Frank Plotkin.
Claimant Frank Plotkin’s rights in the fund rest on the designation of beneficiary. But both the Aberdeen and the Fidelity Capital designations of beneficiary explicitly provide that during his lifetime, decedent George Plotkin should have power to revoke the designation and should have power to exercise all rights, privileges and options with respect to the programs, including the power of partial or complete withdrawal.
To some extent, at least, this power was in fact exercised by decedent George Plotkin during his lifetime. The “ Certificate for Systematic Program ” with respect to Aberdeen Investors Program provides that an investor may make a partial withdrawal of shares and have the shares so withdrawn transferred to his name and delivered to bim after 13 regular monthly pro *760 gram investments have been paid. Immediately after his 13th monthly payment, on May 25, 1962, decedent George Plotkin requested a certificate evidencing the number of shares then held by him in the fund; pursuant thereto there was issued to him under date of June 19, 1962 a certificate for 367 shares of Aberdeen Fund. All this took place while the designation of beneficiary in Frank Plotkin’s favor was in effect.
I hold that George Plotkin’s reservation of absolute power during his lifetime to revoke the designation of beneficiary precludes that designation from being security for George Plotkin’s obligation to Frank Plotkin and that therefore that obligation was an unsecured obligation, at least during George Plotkin’s lifetime.
In Matter of Granwell (20 N Y 2d 91, 96-97 [1967]) the Court of Appeals, considering the rights of a creditor as against both a revocable inter vivos trust created by the decedent and mutual fund shares held in joint accounts, said that “regardless of whether a person designates those to succeed to his interest in property upon his death, if he reserves the power to dispose of the property during his lifetime, he must be regarded as its absolute owner until he dies.” (Accord: City Bank Farmers Trust Co. v. Cannon, 291 N. Y. 125, 133 [1943].) “ As to my creditors, property is mine which becomes mine for the asking, and no words can make an instrument strong enough to hold it for me and keep it from them.” (Ullman v. Cameron, 186 N. Y. 339, 346 [1906]. Accord: Beakes Dairy Co. v. Berns, 128 App. Div. 137 [2d Dept., 1908] [Totten Trust].)
Such arrangements do not constitute a transfer of any interest at all during decedent’s lifetime; and it follows from this that during decedent’s lifetime, at least, they do not create a security interest in one creditor as against other creditors.
6. It is argued that George Plotkin’s estate is estopped to deny Frank Plotkin’s security interest, on an analogy to Katzman v. Ætna Life Ins. Co. (309 N. Y. 197 [1955]). I do not think there is such an estoppel. Frank Plotkin’s son-in-law, Max Malkin, testified that George Plotkin had told him that he had made the designation of beneficiary to “ guarantee ” George’s obligation to Frank. The conversation testified to indicates that this was merely part of a general program that decedent mentioned, of having enough life insurance to take care of all his obligations, and that he purchased mutual funds which he said was a cheaper way of buying life insurance. There is no suggestion that there was any agreement between decedent and claimant that decedent should make such a designation of beneficiary, or that claimant was ever formally notified of the desig *761 nation, or that claimant in any way relied upon this statement by decedent. Thus, there has been no change of position by claimant in reliance upon decedent’s statement. Furthermore, while decedent could perhaps estop himself and his donees or legatees as against claimant’s claim, it is difficult to see how a debtor can estop his general creditors from contending that a particular creditor is an unsecured creditor. (Cf. Ullman v. Cameron, 186 N. Y. 339, 346, supra; Little Falls Nat. Bank v. King, 53 App. Div. 541, 544, supra.) Indeed, if decedent had stated falsely to claimant that decedent had deposited with a bank securities under an agreement that those securities should be held as collateral for decedent’s obligation to claimant and in reliance upon this claimant had lent decedent money, claimant would have a claim for fraud against decedent but it would still be an unsecured claim. Estoppel of the debtor does not, I think, create a security interest as against other creditors. Here, unlike the Katzman case, the only instrument by which it can be claimed that claimant was secured, the designation of beneficiary, by its very terms negated that security, in reserving to decedent complete dominion during his lifetime.
7. On George Plotkin’s death, the contractual situation at least changed. Then under the designation of beneficiary his right to revoke the designation terminated. Then the purported transfer of an interest to Frank Plotkin took effect at least in terms.
The transfer to Frank Plotkin of an interest in the mutual funds was not complete until George Plotkin’s death. As the Court of Appeals said with respect to a joint account of mutual funds, and with respect to a revocable trust: ‘ ‘ Although a transfer of interest was projected, it was not actually completed until [decedent] died ” (Matter of Granwell, 20 N Y 2d 91, 97 supra; Accord: Beakes Dairy Co. v. Berns, 128 App. Div. 137, 138, supra.)
Such a transfer was valid if George Plotkin’s estate was solvent. Sec. “ 3 ” and “ 4 ” above.
But if George Plotkin’s estate was insolvent at the time of his death, then the transfer of the mutual fund interest to Frank Plotkin on George’s death constituted an attempt to prefer Frank Plotkin over other creditors, at least to the extent that his realization on the mutual funds would be greater than the prorata realization by other creditors on their claims.
A debtor may during his lifetime, even though insolvent, prefer one creditor over another, subject to various statutory limitations in special situations, (e.g. bankruptcy, corporations, etc.). But the power of a debtor to prefer one creditor over *762 another ends with death. In the liquidation of a decedent’s estate all general creditors must be treated alike.
This principle was stated in section 212 of the Surrogate’s Court Act at the time of George Plotkin’s death: “ Preference shall not be given in the payment of a debt over other debts of the same class ’ ’. The same principle is restated in SOPA 1811 (subd. 3).
In Little Falls Nat. Bank v. King (53 App. Div. 541, supra), a testator directed that certain debts be a charge on certain real and personal property. The court held that to the extent that this preferred one creditor over others, the provision was invalid, saying “ the right of a testator to prefer or secure one claim to the exclusion of another ends with his life, and the statute determines the order in which his debts must be paid after his death.” (p. 545).
In Woodruff v. Claflin Co. (198 N. Y. 470, 473 [1910]) the court said: “ In the case of the death of an insolvent debtor, the law contemplates equality in the distribution of the proceeds of his estate among his creditors. A creditor who seeks more than his pro rata share of the debtor’s property under such circumstances seeks that which does not belong to him, and makes the other creditors poor in proportion.”
8. Claimant is not helped by section 166 of the Insurance Law which exempts from the claims of creditors the proceeds of life insurance policies. We are riot here concerned with the proceeds of a life insurance policy. Those proceeds were payable to the mutual fund company to discharge an obligation of decedent’s estate to the mutual fund company. What we are here concerned with is the mutual fund shares thus purchased. It is true that to the extent of the insurance, decedent’s estate realizes assets which would not have been available to creditors but for the insurance at the decedent’s death. But the policy considerations which are the basis of section 166 of the Insurance Law are so special that I think the statute should be restricted to the precise situation that it covers, i.e. the exemption of the proceeds of life insurance, rather than extending it to exempt from the claims of general creditors securities purchased with those proceeds.
9. It follows that if the George Plotkin estate was insolvent, then Frank Plotkin and his estate are entitled to share only pro rata with all other creditors, and if Frank Plotkin or his estate have received more than their prorata share they will have to repay the excess. (SCPA 2215, subd. 3; Woodruff v. Claflin Co., 198 N. Y. 470, supra.)
*763 10. However, before the transaction can be invalidated as a preference it will be necessary for the executrix to show ‘1 that the estate was insolvent and the extent of its insolvency ’ ’ (Woodruff v. Glaflin Co., 198 N. Y. 470, 477, supra).
Although it has been intimated that the estate is insolvent, there has as yet been no showing or determination of that and presumably there will be none at least until a decree is entered on this accounting.
11. As claimant was not a secured creditor, I think that claimant was not entitled to deduct the attorneys’ fees of $2,776.61 in connection with the liquidation of the Aberdeen Fund.
C. Conclusions
Accordingly, I conclude that:
(a) Decedent was indebted at his death to claimant in the sum of $63(000 minus $1,790, or $61,210;
(b) There must also be credited against this indebtedness the sum of $27,776.61 received by claimant on January 2, 1964 representing the proceeds of the redemption of Aberdeen Shares;
(c) At the date of the filing of the claim herein, March 9,1964, decedent was indebted to claimant in the principal amount arrived at by deducting from $63,000 the items of $1,790 and $27,276.61, or $33,933.39.
(d) Interest thereon runs at the rate of 6% per annum from the date of the filing of the claim, March 9, 1964.
(e) Claimant is a general creditor of decedent in this amount.
(f) Claimant is not entitled to a greater prorata recovery on his claim as it existed at decedent’s death, i.e. $61,210 (plus interest thereon at 6% per annum from March 9, 1964) than other general creditors.
(g) The rights and interests of the parties in the Aberdeen and Fidelity Capital Funds are as follows:
(i) Claimant had and has a right to enforce his claim of $61,210 (plus interest) against the interest of decedent in the Aberdeen Fund and the Fidelity Capital Fund but is not entitled to be paid a greater proportion of his claim than are other general creditors.
(ii) If, as a result of claimant’s realizations on these funds or otherwise, claimant realizes a greater amount proportionately on his claim than other general creditors, he will be liable to account for the excess pursuant to SCPA 2215 (subd. 3).
(iii) Claimant is not restricted in the enforcement of his claim to the Aberdeen and Fidelity Capital Funds.
*764 (iv) In the event that the ultimate realization on the Aberdeen and Fidelity Capital Fund, together with any other amounts realized by claimant, should exceed the amount of claimant’s claim, the excess will belong to decedent’s estate.
The court cannot now say when there will be a decree in the accounting proceeding which will determine whether decedent was solvent or insolvent. It is, however, important in the interest of all parties that there be a final decree determining the rights of the parties as far as we have gone, particularly as the United States District Court in Massachusetts is awaiting determination of this case, and the determination of some of the issues in this case may avoid their relitigation in Massachusetts. Therefore, a severance will he directed and final decree entered, making the determinations set forth above and reserving until after the final decree in the accounting proceeding any question of repayment of any preferential excess.